IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RAYMOND SKOLODA, :
:
    Petitioner :
:
v. : CIVIL NO. 4:14-CV-00883
:
SUPERINTENDENT GLUNT, et al. : (Judge Brann)
:
    Respondents :

## **MEMORANDUM**

Petitioner Raymond Skoloda has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging a conviction and sentence imposed by the Court of Common Pleas of Luzerne County, Pennsylvania. (Doc. 1). In this petition, Skoloda puts forth two counts of ineffective assistance of trial counsel. Id. For the reasons set forth below, the petition is denied.

**I.**     **Background**

On September 13, 2007, Skoloda's trial commenced for two counts of aggravated indecent assault, one count of indecent assault, and one count of corruption of minors. (Doc. 18, Ex. 1). The first witness called by the prosecution was E.M., the sixteen year old victim in the incident. Id. at 3-4. E.M. testified that she was best friends with Skoloda's daughter, and on the evening of December 9, 2006, she was sleeping over at Skoloda's house. Id. at 5. That evening, E.M. went to sleep in the same bed as her friend. Id. at 6. At some point the next morning,

E.M. awoke to find Skoloda's hand down her pants and fingers were inside her vagina. Id. at 7. Although she was scared, E.M. told Skoloda to get off of her, at which point Skoloda told her to "meet him in his bedroom in five minutes." Id.

E.M. testified that she was scared, and therefore did not run out of the house; instead, she waited until her friend awoke to tell her what had happened. Id. at 8. E.M. did not wake her friend right away to tell her because she was "afraid that she would stop being friends with me." Id. After E.M. told her friend about the incident, the friend got her mother, Barbara Skoloda from downstairs. Id. at 9. E.M. then told Ms. Skoloda what had occurred. Id. E.M. waited to call her father because she was scared what he would do, but after she told her father, they went to police station. Id. at 9-10.

E.M. had spent the night at Skoloda's house several times previously, and testified that nothing appeared out of the ordinary on December 9, 2006. Id. at 11-12. E.M. and her friend were sleeping fairly close to each other on a full size bed which could fit two people, but could "[n]ot really" fit a third person. Id. at 14-15. E.M. was sleeping under the covers while wearing a t-shirt and sweatpants. Id. When she woke the next morning, Skoloda was "partially on top of [her] and alongside of [her] with his fingers in [her] privates[.]" Id. E.M. clarified Skoloda's position by stating that he was "leaning on the bed" near her head with his hands under the covers, but he was not on the blankets. Id. at 16.

When asked whether the bed shook when Skoloda got off the bed, E.M. stated that it did not really shake because Skoloda "wasn't really all the way on it." Id. at 17.  Rather, Skoloda was kneeling on the floor.  Id.  E.M. testified that her friend did not wake up during this incident.  Id.  E.M. never went to the hospital as a result of this incident, nor did she ask Ms. Skoloda to call the police.  Id. at 21.  She waited approximately four or five hours to call her father because she was scared that he "would beat up" Skoloda.  Id. at 22-23.

After E.M. testified, Skoloda's daughter Sammy testified.  Id. at 25.  Sammy stated that on December 9, 2006, E.M. was sleeping over at her house.  Id. at 27.  Sammy testified that the next morning, E.M. was upset and "a wreck[;]" she then proceeded to tell Sammy what had occurred earlier that morning.  Id. at 28.  Sammy went downstairs and told her mother what had happened, and her mother went upstairs to speak with E.M.  Id. at 29.  Sammy testified that during the events that morning, she did not wake up, and agreed with Skoloda's counsel that she was "a pretty heavy sleeper[.]"  Id. at 32.  Sammy did not see any of the events that transpired.  Id.

Ms. Skoloda was then called to testify.  Id. at 39.  Ms. Skoloda stated that on December 9, 2006, E.M. was staying at her home.  Id. at 40-41.  At 5:30 in the morning on December 10, 2006, Ms. Skoloda was awoken by her husband forcing his penis into her mouth.  Id. at 41.  Thereafter, Ms. Skoloda got up and went

3

downstairs to sleep on her couch, where she remained until she was awakened at 11:30 a.m. by her scared and pale-faced daughter telling her they needed to speak upstairs. Id. at 42. When Ms. Skoloda reached her daughter's room, E.M. was crying on the bed, but tearfully explained what had occurred. Id. at 43. Ms. Skoloda told E.M. to call her father, but E.M. was hesitant because she did not want her father to hurt Skoloda. Id.

On cross-examination, Ms. Skoloda acknowledged that she neither saw nor heard anything occur between E.M. and Skoloda that morning. Id. at 45. When she confronted Skoloda, he denied that anything had happened. Id. She argued with Skoloda about the incident, at which point he left the house and did not return for one month. Id. at 46.

Finally, Harry Madara, E.M.'s father, was called to testify. Id. at 53. Around 11 a.m. on December 10, 2006, Mr. Madara received a phone call from his daughter. Id. at 55. E.M. was crying and asked to be picked up, but was evasive about what had occurred. Id. Mr. Madara asked to speak with Ms. Skoloda, who explained what had occurred; at that point, Mr. Madara went to pick up his daughter. Id. at 55-56. Mr. Madara then spoke on the phone with Skoloda, who denied remembering what had happened. Id. at 56.

After the prosecution rested, Skoloda testified to the events that had occurred. Id. at 59. He stated that on the evening of December 9, 2006, he and his

wife were fighting, so she slept on the downstairs couch while he slept on the loveseat downstairs.  Id. at 63.  Skoloda testified that he first became aware that he was being accused of molesting E.M. when his wife woke him up in the morning "screaming in [his] face[.]"  Id. at 65.  Skoloda told his wife that he had not touched anyone because he was sleeping on the loveseat the entire time.  Id.  He informed his wife and E.M. that if they believed he had touched E.M. inappropriately, they should call the police and E.M.'s father.  Id. at 66.  Skoloda stated that his wife and daughter screamed at him for three hours until he left, but never called the police.  Id. at 67.

After leaving his home, Skoloda checked himself into a hospital for fourteen days.  Id. at 67-68.  Skoloda stated that he visited his home every day during the next month, but was not aware that the police were looking for him until January 30, 2007, when the police took him to the police station for questioning.  Id. at 68.  Skoloda further testified that he had contact with E.M. after the incident, and that she had spent the night at his house again after that.  Id. at 70.  He further asserted that during the phone conversation with Mr. Madara, he denied ever touching E.M., and insisted that Mr. Madara was lying about their conversation.  Id. at 71.

Skoloda testified that his daughter's bed was small, but he did not know whether E.M. had slept in the bed that night because he never entered the room.  Id. at 72.  Skoloda reiterated that he never touched E.M. and never performed the

acts that E.M. accused him of. Id. at 73. Skoloda also insisted that his wife was lying; he had never slept in the bedroom with her, and had never attempted to force his penis into her mouth. Id. at 77. Skoloda theorized that E.M. made the story up "[p]robably to get me out of the house because they wanted me out of the house." Id. Skoloda also insisted that his wife, his daughter, and E.M. were all lying about E.M. having no contact with him after the incident occurred. Id. at 78-79.

At the conclusion of the trial, the jury found Skoloda guilty on all counts. Id. at 105.

**A. PCRA Hearing**

On October 7, 2010, Skoloda's Post Conviction Relief Act ("PCRA") hearing was held. (Doc. 18, Att. 3). At that hearing, Skoloda testified that he had met with his trial attorney once before trial for approximately twenty minutes. Id. at 15, 18. At that meeting, Skoloda's attorney allegedly told him "it doesn't matter if you're innocent or you're guilty. You're going to jail anyway." Id. at 15. Skoloda's attorney purportedly never discussed trial strategy with him, and never discussed any of the other witnesses. Id. at 15, 19. Skoloda further testified that his attorney told him at trial to "sit here and be quiet." Id. at 20.

Skoloda primarily believed his attorney did not do an effective job on cross-examination. Id. at 21. Specifically, Skoloda argued that, if acts such as those described by the victim had occurred, there would be no way that his daughter

would have continued sleeping and not be awakened by the noises or movements that occurred.  Id.  Skoloda further believed that his attorney did not argue passionately in his closing argument, and his statement that Skoloda "has maintained his innocence" was subpar.  Id. at 22-23.  Skoloda did admit that his attorney had asked Skoloda's daughter why she did not wake up during this incident, and the daughter stated that she was a heavy sleeper.  Id. at 29-30.

### B. Procedural History

On December 30, 2010, the PCRA Court denied Skoloda's petition.  (Doc. 14, Ex. 1).  Thereafter, Skoloda filed an appeal with the Pennsylvania Superior Court, claiming that his counsel was ineffective for failing to conduct an adequate cross-examination and failing to perform adequately during closing arguments.  Id.  On April 23, 2013, the Superior Court denied Skoloda's appeal, concluding that there was no merit to his arguments.  Id.  On November 12, 2013, the Supreme Court of Pennsylvania denied allowance of appeal.  Com. v. Skoloda, 622 Pa. 758 (2013).  On May 8, 2014, Skoloda filed a petition for writ of habeas corpus before this Court.  (Doc. 1).

In accordance with United States v. Miller, 197 F.3d 644 (3d Cir. 1999), and Mason v. Meyers, 208 F.3d 414 (3d Cir. 2000), this Court issued formal notice to Skoloda that he could either have the petition ruled on as filed but lose his ability to file a second or successive petition, or withdraw his petition and file one all-

inclusive § 2254 petition within the one-year statutory period prescribed by the Antiterrorism Effective Death Penalty Act ("AEDPA"). (Doc. 5). On May 30, 2013, Skoloda returned the notice of election, indicating that he wished to proceed with his petition for writ of habeas corpus as filed. (Doc. 6). On August 11, 2014, the Respondents filed a response. (Doc. 16). Skoloda filed a traverse on August 28, 2014, rendering this matter ripe for disposition. (Doc. 16).

## II. Discussion

Under the AEDPA, "federal courts are to review a state court's determinations on the merits only to ascertain whether the state court reached a decision that was 'contrary to' or involved an 'unreasonable application' of clearly established Supreme Court law, or if a decision was based on an 'unreasonable determination' of the facts in light of the evidence presented." Fahy v. Horn, 516 F.3d 169, 189 n. 20 (3d Cir. 2008) (citing, 28 U.S.C. § 2254(d)). Any factual determinations "made by a State court shall be presumed to be correct[,]" and the petitioner bears the "burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

A state court decision is contrary to clearly established Supreme Court law "if the state court reaches a conclusion opposite to the Supreme Court's own conclusion on a question of law or decides the case differently where the Supreme Court was confronted by a set of materially indistinguishable facts." Harris v.

8

Ricci, 607 F.3d 92, 96 (3d Cir. 2010) (quoting McMullen v. Tennis, 562 F.3d 231, 236 (3d Cir. 2009)).

"Similarly, a state court ruling is considered an 'unreasonable application' if the state court unreasonably applies the correct legal rule to the particular facts, unreasonably extends a legal principle to a new context, or unreasonably refuses to extend the principle to a new context where it should apply." Id.  Under this standard, the state court decision must have been "'objectively unreasonable,' not merely wrong; 'clear error' will not suffice." White v. Woodall, 134 S.Ct. 1697, 1702 (2014) (quoting Lockyer v. Andrade, 538 U.S. 63, 75–76 (2003)).  In applying AEDPA's standards, a district court must review "the state courts' last reasoned opinion" on the matter.  Bond v. Beard, 539 F.3d 256, 289 (3d Cir. 2008).

### A. Ineffective Assistance of Counsel

Skoloda asserts that his trial counsel was ineffective in two ways.  (Doc. 1). First, he contends that counsel was ineffective for failing to properly cross-examine Skoloda's daughter.  Id.  Specifically, he argues that his counsel should have pressed her further on why, if indecent sexual contact was occurring in the same bed that she was sleeping in, she did not wake up.  Id.  Second, he argues that his counsel was ineffective for failing to bring up purported inconsistencies in the victim's testimony during closing arguments.  Id.

9

To establish ineffective assistance of counsel, an individual must satisfy a two-pronged test. Strickland v. Washington, 466 U.S. 668, 687 (1984). First, the petitioner must show that his or her counsel's "performance was deficient" by demonstrating that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. There is a strong presumption that counsel rendered adequate assistance to the petitioner, and judicial scrutiny "of counsel's performance must be highly deferential." Id. at 689.

Second, the petitioner must demonstrate that "the deficient performance prejudiced the defense." Id. at 687. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. The petitioner must establish that "there is a reasonable possibility that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

When an individual asserts ineffective assistance of counsel in a Section 2254 habeas petition, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable[, not whether] defense counsel's performance fell below Strickland's standard." Harrington v. Richter, 131 S.Ct. 770, 785 (2011). "A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland

standard itself." Id.  Thus, a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

   1. *Contrary to Clearly Established Supreme Court Law*

Here, the state court determination was not contrary to clearly established Supreme Court law.  On appeal, the state court considered Skoloda's claim under the correct Pennsylvania standard.  See, doc. 14, ex. 1.  Because Pennsylvania courts apply a substantially identical standard to that required under federal law, the court did not reach a conclusion opposite to the Supreme Court's conclusion on a question of law.  See, Baker v. Patrick, 345 F.App'x 840, 842 (3d Cir. 2009).

Furthermore, Skoloda identified only one United States Supreme Court case in his brief: Herring v. New York, 422 U.S. 853 (1975).  This case does not involve a set of facts that was materially indistinguishable from the facts of this case.  In Herring, the trial court denied defense counsel any opportunity to present closing arguments to the jury.  Id. at 856.  In that case, the Supreme Court concluded that, by entirely denying the opportunity to present closing arguments, the court had denied the defendant "the assistance of counsel that the Constitution guarantees." Id. at 864.  In contrast, here Skoloda's counsel did in fact present closing arguments.  Because the facts presented in Herring were markedly different

11

from the facts of this case, Skoloda has not established that the state court decisions were contrary to firmly established Supreme Court precedent.

### 2. *Unreasonable Application of Supreme Court Precedent*

Additionally, Skoloda has not argued that the state court misapplied relevant federal case law.  See, docs. 1, 2, 16.  Skoloda has, with the exception of Herring, cited exclusively to state court cases in his contention that he was denied effective assistance of counsel.  Id.  Even assuming that the state court wrongly applied state court cases to the facts at hand, such error does not rise to the level required to grant habeas relief.  For a Federal court to grant habeas relief, the state court must have unreasonably applied clearly established Federal law.  28 U.S.C. § 2254(d)(1).  Incorrect application of state law will not suffice.  Reliance on state court cases is not sufficient to grant habeas relief, and a thorough reading of the state court decision provides no basis for an argument that firmly established Federal law was unreasonably applied in this instance.

### 3. *Unreasonable Determination of the Facts*

Finally, the state court did not reach an unreasonable determination in light of the evidence.  In that respect, the Superior Court reached two conclusions.  First, it concluded that Skoloda's counsel was not ineffective in his cross-examination of Skoloda's daughter because he did in fact ask her why she did not wake up during the incident.  (Doc. 14, Ex.1).  Furthermore, the daughter's testimony "could not

have established the impossibility of the assault" as Skoloda claimed, and therefore counsel could not have been ineffective for failing to elicit such testimony. Id. Second, the Superior Court concluded that Skoloda's counsel was not ineffective for failing to discuss allegedly inconsistent testimony in his closing arguments because no inconsistent testimony had been offered by the victim. Id.

Both conclusions were supported by the evidence presented. As the Superior Court correctly noted, Skoloda's counsel did cross-examine the daughter regarding whether she woke up during the assault; Skoloda's daughter replied that she did not wake during the incident, and asserted that she was a "pretty heavy sleeper[.]" (Doc. 18, Ex. 1, p. 32). Thus, Skoloda's counsel did effective cross-examine the daughter. Furthermore, the Superior Court properly noted that "the daughter could only testify about what she did or did nor observe" and could not "establish that the assault could not have happened without her being awakened[.]" (Doc. 14, Ex. 1). Given the factual support for these conclusions, it cannot be said the state court's determination was unreasonable in light of the evidence presented.

Finally, the Superior Court concluded that Skoloda's counsel was not ineffective for failing to point out inconsistencies in the victim's testimony. In that vein, on direct examination E.M. testified that she was lying in bed, and Skoloda was "next to" her. (Doc. 18, Ex. 1, p. 15). E.M. later clarified that Skoloda was leaning against the bed, but was not on top of it. Id. at 16. On cross-examination,

E.M. again confirmed that Skoloda was not on the bed.  Id. at 17.  Thus, the Superior Court correctly concluded that no inconsistent testimony existed, and Skoloda's counsel could not be ineffective for failing to discuss such testimony. Because "fairminded jurists" could at least disagree on the correctness of the state court's decision, this Court must deny Skoloda's petition for writ of habeas corpus. Harrington, 131 S.Ct. at 786.

### B. Certificate of Appealability

Under the AEDPA, a court may not issue a certificate of appealability "unless 'the applicant has made a substantial showing of the denial of a constitutional right.'"  Slack v. McDaniel, 529 U.S. 473, 483 (2000) (quoting 28 U.S.C. 2253(c)).  Thus, the "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Id. at 484.  Skoloda has not made a substantial showing of the denial of a constitutional right and, as a result, a certificate of appealability will not be issued.

## IV. Conclusion

A review of the record reveals that the state court decision was not contrary to, and did not involve an unreasonable application of, firmly established Federal law.  Furthermore, the state court determinations were not unreasonable in light of the evidence presented.  Therefore, the petition for writ of habeas corpus will be denied.

A separate Order will be issued.

BY THE COURT:

s/Matthew W. Brann
Matthew W. Brann
United States District Judge

Dated: March 2, 2015